Ida Drain BIRCHFIELD, Appellant,

v.

James H. HARROD, Attorney, Appellee.

No. 55619.

Court of Appeals of Oklahoma,
Division No. 2.

Jan. 5, 1982.

Released for Publication by Order of
Court of Appeals Feb. 4, 1982.

Ida Drain Birchfield, pro se.

Robert J. Turner, Turner, Turner & Green, Oklahoma City, for appellee.

BRIGHTMIRE, Judge.

This lawsuit departs somewhat from the usual in that a lawyer is condemned by an unhappy former client, Ida Drain Birchfield, primarily for what she says is his psychological inability or unwillingness to follow her legal advice! Our appellate review is made extraordinarily difficult from a legal standpoint because Birchfield, a layman, filed and is prosecuting this appeal apparently without the aid of a lawyer. Her lengthy brief, for instance, violates several court rules, contains an abundance of immaterial discourse, beseeches us to make "a decision embodying new policy," and, what is perhaps most disconcerting, requests us to sit as a "court of peer review, over the conduct of the respondent in this suit." To do this, of course, would require us to go beyond the scope of inquiry circumscribed by specific error said to have been committed by the trial court, that is, the sustention of a demurrer to Birchfield's fourth amended petition.[1] The trial court held the pleading did not state a cause of action and dismissed it without leave to amend further. Plaintiff, of course, appeals. We affirm.

## I

As best we can divine from the ample record, the orientational facts are substantially these. Birchfield married T. Dale Drain in 1958. She inherited some money and during the next 18 years the parties started two business ventures in Oklahoma City, Oklahoma: D & D Floral, Inc. and Ida's Greenhouse, Inc. They also begat four children, acquired a nice home, accumulated considerable personal property and saved some money.

---

1. We might say at this point, however, that we have reviewed the entire record and find nothing that causes us to feel that Attorney Harrod acquited himself other than in a competent and professional manner.

Drain filed suit for a divorce July 27, 1977. Birchfield signed a waiver of summons and notice of hearing and on August 26, 1977, the court rendered an agreed decree granting Drain a divorce, dividing the joint property, confiding custody of two of the children in Birchfield, and awarding her both child support and alimony.

Some months later Birchfield grew dissatisfied with the terms of the decree and on October 13, 1977, hired Harrod to have it set aside. He filed a motion to vacate the decree and on August 30, 1978, an order was entered upholding the divorce but restraining both parties from "making any disposition of the assets of the corporation until the further Order of the court" except that Drain was permitted to continue operation of D & D Floral, Inc., subject to the requirement that he "keep accurate records and refrain from committing waste or purging corporate assets." The court also left in effect all decretal orders relating to child support and alimony and "payments to Birchfield of whatsoever kind," and continued the matter to December 6, 1978, for further hearing. The trial still could not be completed on that date and was passed again to January 11, 1979. In the meantime, on January 2, 1979, Birchfield fired Harrod and hired Attorney George Miskovsky. A new property settlement was reached by the parties which was approved by the court and filed of record January 29, 1979.

On June 11, 1979, Birchfield, acting pro se, filed this action seeking two million dollars "actual and general damages, and $7,500.00 . . . punitive damages" from Harrod because, said she, he "willfully, wantonly and intentionally . . ." caused her to be deprived of a 1977 Cadillac and "was negligent and inept in defence of" her rights in a replevin action brought by General Motors Acceptance Corporation to repossess the Cadillac because of a default in the terms of the financing security agreement.

Later on Attorney Gar Graham appeared in the case on her behalf and filed three amended petitions gradually enlarging her damage claims in each until at last she sought $399,463.15 in actual damages and only $3,000,000 in punitive.

It is, of course, on this fourth amended petition that we will focus our analytical attention in an effort to determine if an actionable claim has been stated. Or to put it differently, if one assumes the operative facts Birchfield alleges to be true, do they entitle her to recover a judgment of some amount from Harrod?

## II

Before dissecting the petition it would be helpful to mention briefly the legal elements required to be factually established in order to prove a case of professional malpractice against an attorney in terms of (1) negligence, (2) intentional harm, or (3) fraud—the three theories alluded to by plaintiff.

 Actionable negligence of an attorney, in short, consists of an injurious breach of a professional duty which the lawyer owes his client.[2] Intentional harm, of course, is injury suffered by the client as a result of her lawyer's intentional malfeasance. Fraud is committed when a lawyer gains some advantage or benefit at the expense of his client by concealing that which he ought to disclose or by misrepresenting as a fact that which he knows to be untrue.

 We have to also bear in mind that to plead a cause of action one must plead essential facts—not merely conclusions of law. A pleading that depends on conclusions of law without properly stating the facts on which the conclusions are based is fatally defective.[3] A "conclusion" has been defined as an inference drawn by the pleader from undisclosed facts.[4]

**2.** *Allred v. Rabon,* Okl., 572 P.2d 979 (1977).

**3.** *Bates v. Old Mac Coal Co.,* Okl., 271 P.2d 315 (1954).

**4.** *Id.*

### III

Birchfield's first petition clearly did not state a cause of action. The most one can make of it is that she was notified by General Motors Acceptance Corporation that it was going to repossess her 1977 Cadillac and that she "did apprise defendant of the illegality of the repossession ..." and "demanded [he] use all legal routes open ... which would have stopped this illegal act ..."; but, the lawyer did not do so and intentionally disregarded "court order of August 30, 1978," (issued in the divorce action) in flagrant violation of her state and federal constitutional rights. Thus, she concludes, defendant "was negligent and inept in defence of the" GMAC replevin action against her.

The thing that stands out the most in this pro se pleading is Birchfield's admission that she attempted to act as her own lawyer and demanded that Harrod carry out her orders. For instance, she says she told her lawyer the GMAC action was illegal and, by implication at least, that there were legal ways to defeat the action. Aside from the fact that a series of legal conclusions bereft of facts are pleaded, a brand new concept in professional malpractice has been unveiled in the pleading—subjection of a lawyer to liability for failure to follow the legal advice of his client.

But let us move on to the fourth and last amended petition. It is somewhat longer and alleges plaintiff employed Harrod and put her complete trust in him. The petition does not allege Harrod is an attorney though he is identified as being one in the caption.

It is first asserted that Harrod "had a duty to protect the Plaintiff [sic], then his client, interests in the material estate during the divorce proceedings." The pleading then concludes that he "failed to properly represent plaintiff in the divorce case ... which resulted in a civil lawsuit for repossession of the Plaintiff's car ...." This statement is followed by another conclusion, namely, that Harrod "failed to take the necessary action" in the replevin action to prevent the repossession. There is no hint as to what such "necessary action" consisted of.

The next paragraph, number five, complains that Harrod "failed to get an audit of the property involved in" the divorce case and this is followed by the conclusion that the failure resulted "in the Plaintiff getting an unequitable share of the division of property acquired during coventry [sic]." In this regard the problem is, first of all, that no rational causal relationship exists between the alleged failure and the conclusion reached.[5] Secondly, there is no allegation Harrod was authorized and provided with funds by his client to obtain an "independent audit." Finally, it is not alleged that such an audit would likely have shown asset values significantly different from those found to exist in the audit financed by Birchfield's former husband. The fact that the husband's audit may have shown the existence of assets worth $150,000 which were included in a mortgage securing a $609,886 loan made some time after the divorce was granted is not evidence the audit was wrong. It could be the lender was overly optimistic; or the note was secured by other properties; or perhaps the loan was guaranteed by other entities or individuals. We do know, for instance, that a real estate mortgage attached to Birchfield's brief discloses that Drain personally guaranteed payment of the loan. Thus the fifth paragraph does not allege any basis for recovery from Harrod.[6]

The sixth paragraph charges Harrod with failing "to get[7] a restraining order in [the divorce case] stopping the plaintiff's husband, Dale Drain, from dissipating over $100,000 of company money on non-business trips and expenses and transporting his then concubine, now wife, on business and

---

5. For all we know Birchfield may have received less had there been an "independent" audit.

6. *Wabaunsee v. Harris*, Okl., 610 P.2d 782 (1980).

7. Emphasis added.

non-business trips with company funds." Significantly, there is no allegation that a restraining order was not *sought.* A lawyer may have a duty to seek a restraining order, and if he does, whether he "gets" one depends on whether the court issues one. Actually, the record discloses a restraining order was sought by Harrod and one was entered on August 30, 1978, which, among others, contained this directive: "Plaintiff [Dale Drain] . . . is restrained from committing any waste or purging of the assets of the corporation, except by special Order of the court." This order is criticized by Birchfield as coming into existence late. But again no facts are alleged that could form the foundation for the conclusion that one could have been obtained sooner. Plaintiff evidently theorizes that such an order was available for the asking without notice. This, however, is not exactly correct. She earlier agreed to a decree of divorce which divided the marital estate and terminated the suit. Under these circumstances her former spouse had to be served with summons and given an opportunity to be heard.[8] Overlooking this, however, Birchfield argues on that Harrod, by December 10, 1977, "should have had a Temporary Order or have an audit for where the $250,000 went"—a sum tendered to D & D Floral as reflected by an exhibit attached to the petition.[9] The consequence of the omissions, plaintiff concluded, was that by "the time the second attorney, George Miskovsky, Sr., was employed on the 2nd day of January 1979, to complete the [divorce] case . . ., the $250,000 or more had disappeared from D & D Floral."

Here again we fail to see a breach of the lawyer's duty alleged. Plaintiff relies on assumptions rather than facts for this element. She assumes, for instance, that the $250,000 disappeared; that a temporary order meeting her approval was available for the asking; that had such been issued the $250,000 would not have "disappeared"; and that an audit would show where the funds went. And with regard to her detriment, the consequence she postulates is a non sequitur. After all, her exhibit indicates the $250,000 she refers to was a note three-fifths of which was "tendered" November 18, 1977, and the remaining $100,000 was to be paid on or before December 10, 1977. Drain had a duty to continue to operate the business and there is no reason to presume that the proceeds were not used properly for this purpose. Moreover, if indeed the $250,000 did "disappear," i.e. was misappropriated, from D & D Floral by the time Miskovsky entered the case, no reason is shown why Birchfield's allegedly neglected interests could not have been adequately protected by way of a judgment against Drain or otherwise. Certainly audits and appraisals could have still been made at the time Miskovsky entered the picture had such been warranted.

■ In paragraph number eight, plaintiff alleges that Harrod "failed to depose witnesses timely which resulted in overtime payments to reporting service to get depositions taken and recorded prior to the trial." And, she goes on, he failed to subpoena this witness and that witness who would testify as to where certain assets went. Such criticisms go to the very core of a lawyer's professional discretion and prerogatives and the results of his decisions are not actionable unless they involve two elements: (1) they manifest professional incompetence, and (2) they cause actual damage to plaintiff. Here plaintiff does not say or attempt to show Harrod was guilty of professional incompetence but, rather, in paragraph nine, charges that his "conduct was willful, wanton and malicious" for two reasons: (1) "he made no effort to get the proper value set on the business," and (2) "he totally

---

8. 12 O.S.1971 § 1031.

9. The exhibit was dated November 18, 1977 and read:

It is mutually agreed that B & E Factors will forward to D & D Floral, Inc., $100,000 on or before December 10, 1977 as full proceeds of a Promissory note signed and dated November 18, 1977 in the amount of $250,000 of which $150,000 was tender November 18, 1977.

s/ Grover L. Ensley
B & E Factors

ignored the fact that the Plaintiff was losing her Cadillac in" the replevin action. And, like so many of her generalizations, the latter "reasons" are unsupported conclusions which in turn do not support the accusation of malicious or intentional malpractice.

In the interest of time and space we summarize paragraphs 10 to 20 with the observation that they thrash through a thicket of similar gripes regarding a host of things Harrod did or failed to do. And like the others they are fatally conclusionary in nature, fail to factually describe any professional shortcoming or fail to disclose that plaintiff suffered any detriment from various real or imagined representational faults.

### IV

At this point a few general observations seem to be in order about this lawsuit in particular and legal malpractice cases in general. And because of the nature of the lawsuit we think an examination of the record might be helpful in shedding light on what may have motivated it.

The record contains the petition Harrod filed November 17, 1977, to vacate the divorce decree. In it Birchfield admitted she signed a waiver of notice but said the decree was obtained by fraud in that the decree signed by the judge differed "substantially" from the decree form she approved (a copy of each of which was attached) and that Drain was dissipating the assets awarded him. She asked the court to set the matter for hearing immediately, vacate the decree and grant her such equitable relief as was warranted by the evidence.

Drain was soon served with summons, appeared, and on January 13, 1978, filed an application for a temporary restraining order and injunction enjoining Birchfield from doing what she had been doing for some time—calling major suppliers, financial backers, and sales representatives of D & D Floral, Inc.; talking to them at length; and falsely telling them that both the corporation and Drain were on the verge of bankruptcy, that Drain was draining the

corporation of its assets and that he was a poor risk.

Moreover, on January 5, 1978, Birchfield had filed a second lawsuit (CD–78–7), asking for an accounting and for the appointment of a receiver for D & D Floral. The foundation for that suit, Drain said, was the same as that presented in the divorce action. The fact is, he alleged, that he had successfully run the business for several years but that his ability to continue to do so was being greatly impaired by the constant degrading attacks on his character and integrity. Birchfield moved February 2, 1978, to dismiss this application and asked the court for suit money and an order allowing her to inspect and reproduce or photograph all D & D Floral property.

In his answer to Birchfield's petition to vacate the decree, Drain denied any wrong doing and hit hard on the facts that the property settlement was one the parties had discussed at length and that the reason the decree form signed by Birchfield was not the one presented to the judge was because over a period of 30 days Birchfield had suggested several amendments and additions inuring to her benefit which Drain agreed to. He alleged the first approved decree as amended by Birchfield was the one tendered to the court for signature.

Parenthetically, we have examined the two forms of the decree attached to Birchfield's pleading and find that no significant changes were made and the ones made were beneficial to Birchfield.

The record also contains copies of D & D Floral audit reports for the fiscal years ending June 30, 1976 and 1977, prepared by a firm of certified public accountants—an audit firm Birchfield blasted as a "ringer." Yet while she assails Harrod for not procuring another audit she does not allege the one in evidence was in error, nor does she allege she stood ready, willing and able to advance the money for a second audit and other costly searches for information. Certainly the lawyer is not obliged to finance the litigation as he evidently was expected to here. One attachment to Birchfield's

brief is a letter from Harrod dated December 11, 1978, responding to hers of December 10, disclosing, among other things, that he requested a deposition expense deposit along with money needed to have certain records duplicated. He also asked her to hire an appraiser and advised her that if she was unhappy with his handling of the case, to hire another lawyer.

As a matter of fact, Harrod had asked the court to require Drain to pay suit expenses on July 13, 1978, but after hearing evidence the court declined holding only that Birchfield could spend $500 for depositions and $250 for appraisers which would be taxed as costs. One may infer from the nature of this order that the court sensed Birchfield was more interested in harassing Drain than in achieving justice.[10]

The parties filed extensive briefs, a pretrial conference was held and Harrod filed a "Motion in Limine" in an effort to prevent Drain's motion for custody of two children (he already had custody of one) from becoming embroiled in Birchfield's quest for more of the marital estate.

The pleadings and briefs filed by Harrod are numerous and appear to be neat, carefully drawn and designed to protect the rights and best interest of his client.[11] He may not have achieved every legal goal set for him by Birchfield but he did succeed in having the property settlement portion of the divorce decree set aside and, with the help of another attorney, she reached a somewhat better settlement than the first one she agreed to.

And, interestingly, even though the trial judge set the original settlement aside Birchfield takes a hefty swing at him also. Him she castigates for suggesting the possibility of solving the problem by ordering a sale of the corporate assets. "Threat of sale," she says, "pressured [her] into a settlement under duress."

The main thrust of her case is, then, that Harrod failed to protect her "equity" in the marital estate. "When you hire an attorney in a situation like this," she writes, "he becomes an effective trustee of your claims. He becomes a trustee in a kind of a resultant trust. His function then is not to obtain a minimum settlement for his client; his function is to protect all her equity, which is in effective resultant trust to him."

■ This erroneous perception of a lawyer's role accounts, we think, for the weaknesses that underlie her lawsuit. A lawyer is not a trustee of any claim or asset owned or sought by his client. His duty is to see that the ascertainable rights of his principal are protected as fully as possible under the prevailing circumstances within the bounds of common sense and proper professional practices. The identification of what such practices consist of is easier in some legal areas than others. One of the most difficult areas is the divorce aspects of family law, particularly as it pertains to division of property and alimony. Undoubtedly the

---

**10.** In an attachment to her brief, Birchfield states some "facts" which reveal an emotional and bitter woman who felt she was cast aside for "Mr. Drain's 23-year-old lover" who, she said, "was living and traveling with" him. In a part of her brief she refers to as her "Theory of Case," she alludes to Drain falling for a Dallas, Texas "golddigger" and using company funds to finance the romance.

**11.** Pleadings on behalf of Birchfield filed by Harrod are these:
(1) Petition to Vacate Judgment in Decree of Divorce, November 17, 1977
(2) Motion to Dismiss Application For Injunction and Temporary Restraining Order, February 2, 1978
(3) Motion for Discovery, Inspection and Production of Documents, February 2, 1978

(4) Application for Suit Money, February 2, 1978
(5) Application for Suit Money, July 13, 1978
(6) Application for Citation, August 21, 1978
(7) Motion for Discovery and Production and Inspection, August 25, 1978
(8) Citation, August 25, 1978
(9) Response Brief In Response to Summary of Pertinent Facts, August 28, 1978
(10) Motion in Limine, August 28, 1978
(11) Entry of Appearance, October 18, 1978 (replevin action)
(12) Order, January 9, 1979
(13) Motion to Withdraw, January 18, 1979
(14) Motion to Fix Attorney's Fees, Tax Costs and Suit Money, January 18, 1979
(15) Not shown in record is a separate lawsuit for the appointment of a receiver filed during January, 1978.

reason for this lies in the fact that there are indistinct criteria to guide counsel and the court, coupled with the fact that the court has such wide discretion in the equitable resolution of the issues.

Oftentimes a misconception of the lawyer's proper role results in a client's making unreasonable demands on and setting unrealistic goals for him. Birchfield characterized herself as "a very savvy business woman, who had inherited a bequest she cannily used to set herself up in business with her husband, [and] was," she says, "driven out of her business and fleeced of her equity, because [Harrod] ... was, we can only surmise, more interested in *his* business interests than his profession as an attorney." Here plaintiff hints at a theory she refers to as the "psychology of the case"—a theory she points to as the real foundation for this lawsuit.[12]

■ We are of the opinion that the final judgment—the judgment based on a settlement engineered by Miskovsky—is conclusive as to all issues embraced by the Drain divorce proceedings, which include, of course, an accounting for the questioned $250,000. Having agreed to the judgment Birchfield has expressly affirmed her satisfaction with the judicial award as giving her a full spousal share of the marital estate. And this, we hold, forecloses recovery by her of yet more money under the guise of malpractice damages from attorney Harrod.

The trial court did not err in sustaining the defendant's demurrer to plaintiff's petition.

Affirmed.

BACON, P. J., and BOYDSTON, J., concur.

---

**12.** It is a somewhat bizarre hypothesis centered around Harrod's lifestyle which she perceived as a psychological impairment of his ability to conceptualize her equitable entitlement.